UNITED STATES of America, Appellee,

v.

Shawn PETERSON, Defendant–Appellant.

No. 339, Docket 96–1212.

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 1996.

Decided Nov. 4, 1996.

Bernadette Miragliotta, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Emily Berger, Assistant United States Attorney, Brooklyn, NY, on the brief), for Appellee.

Peter J. Fabricant, New York City, for Defendant–Appellant.

Before: KEARSE, LEVAL, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Shawn Peterson appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Sterling Johnson, Jr., *Judge*, convicting him, as a convicted felon, of possessing a firearm, in violation of 18 U.S.C. § 922(g)(1) (1994). He was sentenced principally to 87 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Peterson contends that the district court erred (1) in denying his pretrial motion to suppress evidence, and (2) in excluding at trial the testimony he had given before a state grand jury. Finding no merit in his contentions, we affirm.

## I. BACKGROUND

This case arose out of events that occurred early in the morning of September 20, 1994. The description by government witnesses included the following.

At approximately 12:50 a.m., New York City Police Officers Michael Saladino and Ischaler Grant were patrolling a high-crime area of Brooklyn in which police had made numerous arrests for weapons and narcotics offenses. Though they were in plain clothes and an unmarked car, Saladino and Grant were well known in the area as police officers. They observed three men, including Peterson, who had been standing on the sidewalk; when the men noticed the officers, they ducked behind a parked vehicle. Suspicions aroused, the officers parked and exited their car. As they did so, one of the three men emerged from behind the vehicle, identified himself as a security guard in a nearby housing project, and said, "Everything's all right over here." The officers, who were aware that some security guards at the project had been involved in ongoing criminal activity, including the possession and sale of guns, produced their identification and asked the men their names, addresses, and reasons for being at that location.

Peterson, who wore a noticeably bulging knapsack on his back, gave his name; as to his address, he at first stuttered Georgia but then changed his answer to Hempstead (a New York town). He appeared nervous, agitated, and evasive. He told the officers that he had come to visit a friend; when asked the friend's name, he did not answer. During the questioning of Peterson, the two other men departed without hindrance. When Peterson was asked what was in the knapsack, he responded, "what knapsack?" After Saladino pointed out the obvious, Peterson responded that there was nothing in the knapsack. When Saladino stated that he could clearly see that there was something in the knapsack, Peterson stated, "it's not my knapsack." Saladino then asked whether he could examine it, and Peterson removed the bag and handed it to Saladino. Inside the knapsack, Saladino found two .25 caliber semi-automatic handguns and several rounds of ammunition.

Peterson was arrested and taken to the police station. After being advised of his *Miranda* rights, he told the police that he had been given the knapsack by Anthony Woods, one of the men on the scene who had departed. Peterson admitted that he had given Saladino permission to search the bag.

In October 1994, Peterson was indicted by a New York State grand jury for firearm possession. In February 1995, on the basis that he had been convicted of a felony in New York State in 1988, Peterson was indicted by a federal grand jury for possession of firearms by a felon. The state charge against Peterson was dismissed without prejudice.

Prior to trial, Peterson moved to suppress the evidence seized incident to his arrest. United States Magistrate Judge Roanne L. Mann, to whom the motion was referred for report and recommendation, received written submissions and heard evidence presented by the government, including that described above; Peterson did not testify. The magistrate judge recommended that the motion be denied on the grounds that Peterson's encounter with the police was consensual and did not require reasonable suspicion, and that even if the encounter became a detention upon Saladino's asking what was in the bag, the officers had reasonable suspicion justifying the detention. The magistrate judge further opined that Peterson's rights were not violated by the search of the knapsack, either because by denying ownership Peterson had abandoned it, or because, if he did not abandon it, he gave valid consent to its search. The district judge adopted the magistrate judge's recommendations and denied the motion to suppress.

At trial, the seized evidence was admitted. Peterson did not testify, but he sought to introduce testimony he had given to the state grand jury that had indicted him based on the same conduct. Before the state grand jury, Peterson had testified to the effect that the knapsack did not belong to him and that he had been asked by Woods to hold it "for a second" just as the police officers arrived on the scene. The trial court ruled that the testimony was not admissible against the government.

The jury found Peterson guilty as charged, and he was sentenced as indicated above.

## II. DISCUSSION

On appeal, Peterson contends that the district court should have granted his pretrial motion to suppress and should have admitted his prior state grand jury testimony at trial. Neither contention has merit.

### A. *The Denial of the Suppression Motion*

In challenging the district court's denial of his suppression motion, Peterson admits that his encounter with the officers began as a consensual interview; but he contends that it escalated into an impermissible investigative detention without reasonable suspicion when the police officers asked about the contents of the knapsack. He also contends that the detention "tainted" his subsequent disclaimer of ownership of the bag and his consent to search it. We reject these contentions.

 We reject first the contention that Peterson was seized in violation of his rights under the Fourth Amendment. In a consensual encounter, which need not be based on suspicion, officers may permissibly ask questions, such as why the subject is at that location, and may make requests for identification and permission to inspect luggage. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387–88, 115 L.Ed.2d 389 (1991). A consensual encounter ripens into a detention or a seizure when, "under the circumstances, a reasonable person would have believed that he was not free to leave." *Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 155 (2d Cir.1995) (internal quotation marks omitted). For an interviewee to feel free to leave, however, there is "no requirement that an officer affirmatively advise [him] that he is free to leave or terminate the interview." *United States v. Springer,* 946 F.2d 1012, 1016 (2d Cir.1991). If a seizure or investigatory detention has occurred, it must have been based on a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quot-

ing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

After a motion to suppress has been denied, the evidence supporting that denial is to be viewed in the light most favorable to the government, *see, e.g., United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *United States v. Jackson,* 652 F.2d 244, 246 (2d Cir.), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981), and the findings of the district court will not be overturned unless they are clearly erroneous, *see, e.g., United States v. Madison,* 936 F.2d 90, 92 (2d Cir.1991); *United States v. Ramirez–Cifuentes,* 682 F.2d 337, 344 (2d Cir.1982); *United States v. Wiener,* 534 F.2d 15, 17 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Whether, in light of the facts, a seizure occurred is a question of law to be reviewed *de novo. See, e.g., United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995).

We see no clear error in the district court's findings as to the officers' conduct or their observations of Peterson and his companions. The finding that the three men had behaved suspiciously in a high crime area by ducking out of sight upon seeing the police officers was supported by the evidence presented at the suppression hearing. The officers also noted the inconsistency in Peterson's statements as to his address and observed his apparent nervousness. We see no error in the district court's finding that the officers did not prevent Peterson's companions from departing and did not indicate to him that he was not free to leave, or in its ruling that the encounter, which Peterson acknowledges was initially consensual, did not become a detention merely because the officers asked what was in the knapsack he was carrying. Nor, in light of the court's factual findings as to the officers' observations, do we see error in the alternative ruling that even if that question converted the encounter into a detention, the officers had reasonable suspicion warranting that minimal intrusion.

Peterson's contention that his Fourth Amendment rights also were violated by the officers' search of the knapsack lacks merit because officers may search property without violating the Fourth Amendment if the owner or lawful custodian voluntarily gives consent. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). A person may give such consent even if he is in custody. *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Whether an individual has voluntarily given consent is essentially a fact-based inquiry that must be "determined by the 'totality of all the circumstances.'" *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993) (quoting *Schneckloth v. Bustamonte,* 412 U.S. at 227, 93 S.Ct. at 2048), *cert. denied,* — U.S. —, 114 S.Ct. 1415, 128 L.Ed.2d 86 (1994). The district court's finding that consent was given voluntarily will not be overturned unless it is clearly erroneous. *See, e.g., United States v. Hernandez,* 5 F.3d 628, 632 (2d Cir.1993).

Here, there was evidence that when the officers asked whether they could examine the bag, Peterson simply removed it and handed it to Saladino; further, at the police station, Peterson admitted that he had given Saladino permission to search the bag. Accordingly, we see no error in the district court's finding that, assuming Peterson retained ownership rights in the knapsack after disclaiming ownership, he gave voluntary consent when the officers asked permission to search the bag.

We conclude that Peterson's suppression motion was properly denied in all respects.

### B. *The Exclusion of Peterson's State Grand Jury Testimony*

In the state grand jury proceeding, Peterson testified that he had been asked by Woods to hold the knapsack "for a second" just as the police officers arrived on the scene. At trial in the present case, Peterson declined to testify, invoking his Fifth Amendment privilege against self-incrimination, but attempted unsuccessfully to introduce his state grand-jury testimony. He contends that the trial court erred in ruling that the testimony was not admissible under Fed. R.Evid. 804(b)(1). We disagree for several reasons.

Under Rule 804, the hearsay rule does not bar admission of the prior testimony of an unavailable declarant

> if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Fed.R.Evid. 804(b)(1). The district court refused to admit Peterson's grand jury testimony on the ground that the United States, against which Peterson sought to offer his prior testimony, was not a party to the proceedings before the state grand jury. We see no abuse of discretion in that ruling.

■ It has been well established in various contexts that the federal government and a state government are separate sovereigns. The dual sovereignty principle means, for example, that a defendant may be prosecuted first by one sovereign and subsequently by the other without violating principles of double jeopardy. *See Heath v. Alabama,* 474 U.S. 82, 88–89, 106 S.Ct. 433, 437–38, 88 L.Ed.2d 387 (1985). Similarly, criminal collateral estoppel, a relative of double jeopardy, *see Ashe v. Swenson,* 397 U.S. 436, 442–45, 90 S.Ct. 1189, 1193–95, 25 L.Ed.2d 469 (1970), generally may not be invoked against one sovereign on the basis of a ruling in a prosecution brought by a different sovereign, *see, e.g., United States v. Davis,* 906 F.2d 829, 832–33 (2d Cir.1990). In *Davis,* we refused to hold that an order suppressing evidence in a state-court prosecution must be given effect in a subsequent federal-court prosecution. *Id.* at 835.

■ The dual sovereignty concept may yield, however, if one sovereign effectively controlled the other, for example if "the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *Bartkus v. Illinois,* 359 U.S. 121, 124, 79 S.Ct. 676, 678, 3 L.Ed.2d 684 (1959). In *United States v. Davis,* we "recognize[d] that pursuant to the doctrine of collateral estoppel, a nonparty to an action can be bound by the determination of issues decided in that action if it 'controls or substantially participates in the control of the presentation on behalf of a party.'" 906 F.2d at 833 (quoting Restatement (Second) of Judgments § 39 (1982)). However, we also noted that "it has long been recognized that mere participation by federal agents in an investigation does not implicate the United States as a sovereign" in an ensuing state prosecution. *United States v. Davis,* 906 F.2d at 834 (citing *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984)). Nor does participation by local officers in an investigation that leads to a federal prosecution implicate the state as sovereign. *See Archer v. Commissioner of Correction,* 646 F.2d 44, 48 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981). We have not conflated the sovereigns where there was no persuasive evidence that the state "acted as a tool of the federal government," *United States v. Ng,* 699 F.2d 63, 68 (2d Cir.1983), and certainly not where there was no showing that federal prosecutors even aided the state prosecutors during the proceeding at issue, *see United States v. Davis,* 906 F.2d at 835. *See also United States v. Bonilla Romero,* 836 F.2d 39, 43 (1st Cir.1987), *cert. denied,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988) (state court result will bind federal prosecutors only if they "substantially control[led]" the state action or were "virtually represent[ed]" by the state prosecutor).

Peterson has presented no such evidence here. Though he contends that the change in party occurred only because the federal and state governments jointly decided to "transfer" the prosecution from state to federal court, and that the "true spirit" of Rule 804(b)(1) compels admission of the prior testimony (Peterson brief on appeal at 24), the record falls far short of showing any participation by the federal government in the state proceedings, much less showing federal control. Peterson was arrested on the street by local police officers on patrol, not as part of an ongoing investigation; no federal officers were involved. Peterson was brought before the state grand jury less than three weeks later; no federal prosecutors were present or involved in the conduct of the state grand jury proceedings.

The federal authorities' decision to prosecute was apparently made later. Peterson

has made no showing that the federal government was in any way party to, or had any opportunity to develop Peterson's testimony at, the state grand jury proceeding. Accordingly, the district court's decision to exclude the state grand jury testimony on that basis was correct.

■ Further, even if the district court had viewed the state and federal governments as the same party, it would properly have excluded the grand jury testimony for two other reasons. First, the similar-motive requirement of Rule 804(b)(1) was not met, for the prosecutorial interest in cross-examining Peterson before the grand jury was not similar to the interest in cross-examining him at trial. *See, e.g., United States v. DiNapoli,* 8 F.3d 909, 914–15 (2d Cir.1993) (en banc) ("proper approach ... in assessing similarity of motive under Rule 804(b)(1) [is to] consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue"). Though in *DiNapoli* we refused to accept the proposition that a prosecutor's motives at the grand jury and at trial are always dissimilar, *see* 8 F.3d at 914, we noted that they can be dissimilar

> because of the low burden of proof at the grand jury stage.... At the grand jury, the prosecutor need establish only probable cause to believe the suspect is guilty. By the time the exonerating testimony is given, such probable cause may already have been established to such an extent that there is no realistic likelihood that the grand jury will fail to indict. That circumstance alone will sometimes leave the prosecutor with slight if any motive to develop the exonerating testimony in order to persuade the grand jurors of its falsity.

*Id.* at 913.

That circumstance was present in the state grand jury proceedings at issue here, for even Peterson, in addition to giving self-exculpatory testimony, testified that he was wearing the knapsack strapped to his back. Thus, the evidence before the grand jury provided ample probable cause to indict Peterson for possession. The district court

would have been well within the proper bounds of discretion to conclude that, in light of the evidence already before the grand jury, the prosecutor's interest in probing the self-exculpatory aspect of Peterson's testimony was far less intense than it would have been in probing such testimony at a trial.

■ Second, the "true spirit" of Rule 804(b)(1), inaptly invoked here by Peterson, would properly have led the district court to reject Peterson's proffer on the ground that his invocation of his Fifth Amendment privilege against self-incrimination did not make him "unavailable" within the meaning of Rule 804. In general, a person who properly invokes his Fifth Amendment privilege, leaving others powerless to compel his testimony, is considered to be unavailable to others for purposes of Rule 804. *See, e.g., United States v. Bahadar,* 954 F.2d 821, 828 (2d Cir.), *cert. denied,* 506 U.S. 850, 113 S.Ct. 149, 121 L.Ed.2d 101 (1992); *United States v. Lang,* 589 F.2d 92, 95 (2d Cir.1978). However, the Rule expressly provides that "[a] declarant is not unavailable as a witness if ... absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying." Fed.R.Evid. 804(a). When the defendant invokes his Fifth Amendment privilege, he has made himself unavailable to any other party, but he is not unavailable to himself.

At least one other circuit has ruled that a defendant who exercises his privilege not to testify at a second trial of his case is not entitled to introduce the testimony he gave at the first trial:

> The sponsor of a declarant's former testimony may not create the condition of unavailability and then benefit therefrom. The rule [the defendant] relies upon was designed to ensure one access to testimony where, by the actions of the opponent, or at least through no fault of the testimony's proponent, a desired witness becomes unavailable. In the instant case, [the defendant] created his own unavailability by invoking his fifth amendment privilege against self-incrimination.

**14**

*United States v. Kimball,* 15 F.3d 54, 55–56 (5th Cir.) (footnotes omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994). It would have been well within the discretion of the district court in the present case to exclude Peterson's prior grand jury testimony on the ground that he did not, by exercising his Fifth Amendment right not to testify, become unavailable within the meaning of Rule 804.

## CONCLUSION

We have considered all of Peterson's contentions on this appeal and found them to be without merit. The judgment of conviction is affirmed.