

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00065-CR

CHARLES JAMES SNYDER                                        APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

------------

## FROM COUNTY CRIMINAL COURT NO. 8 OF TARRANT COUNTY
## TRIAL COURT NO. 1295355

------------

## MEMORANDUM OPINION[1] ON REHEARING

------------

## I. Introduction

After reviewing the State's motion for rehearing, we deny the motion. We withdraw our October 2, 2014, opinion and judgment and substitute the following.

In two issues, Appellant Charles James Snyder appeals the denial of his motion to suppress and the sufficiency of the evidence to support his conviction

---

[1]See Tex. R. App. P. 47.4.

for failure to identify, arguing that there was no lawful detention. We reverse the trial court's judgment and render a judgment of acquittal.

## II. Sufficiency

In his second issue, which we will address first, Snyder argues that the evidence is insufficient to support the jury's verdict because the State failed to prove that officers lawfully detained him.

## A. Factual Background

At trial, Sergeant Leach testified that on August 27, 2012, he was on his daily patrol in a high-crime area at around 4:15 p.m. when he saw a bike tire in some bushes. He drove past the area and saw someone lying on the ground in the bushes; he made eye contact with that person and thought that the person might be trying to hide from him. By the time Sergeant Leach turned his vehicle around, he could not find the person he had seen in the bushes. A few minutes later, Sergeant Leach stopped a man on a bicycle, questioned him, and then let that man go. Sergeant Leach then drove back past the bushes—three additional police officers in squad cars joined him—and found Snyder still in the bushes.

Sergeant Leach exited his car with his gun drawn and told Snyder several times to show him his hands. Officers warned Snyder that they would tase him and shoot him if he tried to escape. When Sergeant Leach pulled Snyder from the bushes, he detained him in handcuffs because Snyder would not show his hands, and Sergeant Leach thought Snyder's location and actions were suspicious. Police found no weapons or any other illegal items on Snyder.

2

Sergeant Leach asked Snyder why he had been hiding. When Snyder responded that he had not been hiding, Sergeant Leach responded by asking, "[W]hat games are you F-ing playing out here?" Snyder told him that he was not playing games. Sergeant Leach then asked Snyder what he was doing out there, and Snyder replied, "I don't know." Sergeant Leach asked Snyder if he was drunk or a pervert, and Snyder said, "Neither."

Sergeant Leach asked Snyder for his name, and Snyder replied, "Jim Morgan." Sergeant Leach asked Snyder his middle name; Snyder responded, "James." Sergeant Leach then asked Snyder for his date of birth, and Snyder said, "January 7th, 1957." Snyder gave the officers the same name, same date of birth, and same social security number each time he was asked. When Sergeant Leach asked Snyder if he had a driver's license or state identification, Snyder told him that he had a Michigan identification. Sergeant Leach said that if this had been true, he would have been able to find him in the computer system, but when he checked for driver's licenses under Jim Morgan in Michigan, he did not get any returns.

Sergeant Leach then asked Snyder if he had identification in any other states. Snyder said Ohio, but when Sergeant Leach tried to find Jim Morgan in the computer with an Ohio identification, he did not find anyone. Sergeant Leach testified that because he could not locate a record of "Jim James Morgan" and because "Jim" was a nickname for "James", he suspected Snyder was being dishonest and that he was giving false identifying information. Based on this

3

information, he decided to take Snyder to the Tarrant County Jail to further attempt to identify him.[2]

Following the direct examination of Sergeant Leach, the jury watched State's Exhibit 1, the dashboard camera video-recording of the incident.[3]

## B. Standard of Review and Applicable Law

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

A person commits the offense of failure to identify if he intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has lawfully arrested or detained him. Tex. Penal Code Ann. § 38.02(b)(1), (2) (West 2011).

---

[2]Using the Tarrant County jail's iris scan, police identified Snyder in less than a minute with his real name and real date of birth, which were not the ones he had given to Sergeant Leach. The proper identification revealed that Snyder had an active warrant for his arrest on a probation violation.

[3]The dashboard camera video shows that when Sergeant Leach arrived at the scene, two patrol cars were already parked on the street a few feet from where they had detained Snyder. Once Sergeant Leach arrived, one officer pulled his vehicle closer, and a few seconds later, another officer arrived, totaling four patrol cars. The officers yelled at Snyder to show his hands, threatened to tase him, and then threatened to shoot him in the side if he ran.

## C. Analysis

Snyder argues that the evidence is insufficient for a rational trier of fact to determine that Officer Leach had reasonable suspicion that Snyder had committed any crime and therefore that the detention was lawful. Snyder asserts that the only information known to Sergeant Leach before he detained Snyder was that Snyder was on the side of the road under a bush.

The State argues that concealment in a high-crime area is sufficient to establish reasonable suspicion and relies on federal cases that are distinguishable from the facts of this case.[4] In the first case, *United States v. Sims*, officers reported to a shots-fired call. 296 F.3d 284, 285 (4th Cir. 2002). When they arrived at the scene, they had the suspect's description, the defendant was the only person there and matched the suspect's description, and the defendant was located not far from where the shots had been fired a few minutes before the call. *Id.* at 287. The court stated that an officer could have reasonably concluded that the defendant was evading the officers, stating that the "[defendant's] behavior, while apparently evasive, was well short of 'headlong flight' *and might not have given rise to reasonable suspicion in a different*

---

[4]The State equates flight with concealment, but while flight and hiding may both indicate consciousness of guilt, *see, e.g.*, *Jordan v. State*, Nos. 02-12-00470-CR, 02-12-00471-CR, 02-12-00472-CR, 2014 WL 1663404, at *4 (Tex. App.—Fort Worth Apr. 24, 2014, no pet.) (mem. op., not designated for publication), Sergeant Leach's subjective opinion that Snyder was trying to hide is not dispositive, *see Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

*context*." *Id.* (emphasis added).  In contrast, Sergeant Leach was not responding to any calls and did not have a description of a suspect because he was not looking for a suspect, and there were people other than Snyder in the area.

In the second federal case, *United States v. Peterson*, plain-clothes officers were patrolling a high-crime area when they saw three men standing on the sidewalk.  100 F.3d 7, 9 (2d Cir. 1996).  The men ducked behind a car when they saw the officers.  *Id.*  This made the officers suspicious, and they approached the men.  *Id.* at 10.  The court concluded that this was a consensual encounter because two of the men left without hindrance; because the initial encounter was consensual, the court did not determine whether the fact that the men had ducked behind a car, by itself, was sufficient to support reasonable suspicion.  *Id.* at 9–11.  In contrast, Sergeant Leach immediately detained Snyder during their initial contact by pulling his weapon and ordering Snyder out of the bushes.  *Cf. St. George v. State*, 237 S.W.3d 720, 726 (Tex. Crim. App. 2007) (stating that absent reasonable suspicion, officers may conduct only consensual questioning).

Sergeant Leach saw Snyder at 4:30 p.m. in a high-crime area where no crime had been reported, and the basis for the stop by Sergeant Leach and three other police officers was that Sergeant Leach thought Snyder was hiding from him.  *See Domingo v. State*, 82 S.W.3d 617, 618 (Tex. App.—Amarillo 2002, no pet.) (holding no reasonable suspicion existed to support detention when defendant's conversation with officer occurred at 9:00 p.m. in high-crime area,

6

defendant was part of a group that was lawfully socializing and drinking alcohol without engaging in disruptive or illegal activities, and the officer was not responding to or investigating reports of criminal activity);[5] *Scott v. State*, 549 S.W.2d 170, 172–73 (Tex. Crim. App. 1976) (holding that no reasonable suspicion existed when officer patrolling a high crime area was aware of recent thefts and saw defendant drive a sparsely traveled street at 1:30 a.m. with "sheeting material" in his car's back seat). *Compare Jones v. State*, 926 S.W.2d 386, 389 (Tex. App.—Fort Worth 1996, pet. ref'd) (holding no reasonable suspicion existed when officers saw defendant's truck emerge at 10:25 p.m. from public park that had previously been used by people to smoke marijuana, have sex, abandon stolen vehicles, and conceal minors drinking alcohol and that was located across from some recently burglarized homes), *with Balentine v. State*, 71 S.W.3d 763, 766–69 (Tex. Crim. App. 2002) (concluding that officer reporting to a shots-fired call had reasonable suspicion to detain defendant when it was 2:26 a.m. in a residential, low-traffic area, and the officer saw the defendant across the street from the scene before defendant walked briskly away and appeared nervous, constantly looking over his shoulder at the officer).

---

[5]In *Domingo*, after the police officer detected a strong odor of alcohol on the defendant's breath, he detained him for further investigation. 82 S.W.3d at 619. Once detained, the defendant gave a false name and date of birth to the officer. *Id.* When the officer was unable to locate the defendant in the system, he suspected that he had been given a false name and took the defendant to the police station for further identification. *Id.* At the police station, he confirmed that the defendant had given him a false name and that the defendant had outstanding warrants. *Id.*

Other than Snyder's location in the bushes in a high-crime area, no other facts support an inference that criminal activity had or would be occurring. *See Crain v. State*, 315 S.W.3d 43, 53 (Tex. Crim. App. 2010) (holding that "level of criminal activity in an area . . . [is not] suspicious in and of [itself]"); *see also Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994) (stating that the high-crime reputation of the area where the detainees were seen is not enough by itself to support an investigative stop); *cf. Williams v. State*, No. 01-93-00874, 1994 WL 400292, at *2 (Tex. App.—Houston [1st Dist.] Aug. 4, 1994, pet. ref'd, untimely filed) (not designated for publication) (holding that officer had reasonable suspicion to detain appellant when driver of stolen car had fled scene of accident, bystanders pointed out the direction in which he had fled, and officer found appellant hiding under some bushes).

The State asserts that because Snyder refused to show his hands, it was reasonable for Officer Leach to detain him for officer safety by pulling his weapon and handcuffing him. In support of this argument, the State cites *Rodriguez v State*, No. 01-02-00174-CR, 2003 WL 360632 (Tex. App.—Houston [1st Dist.] Feb. 20, 2003, pet. ref'd) (mem. op., not designated for publication). However, there are some very important differences between the case cited by the State and this case.

In *Rodriguez*, two officers responded to a possible vehicle burglary. *Id.* at *1. As they approached the area, they spotted the defendant leaving the area. *Id.* When officers approached the defendant to ask him some questions,

8

the defendant placed his hands behind his back and began backing away from the officers. *Id.* Officers asked to see the defendant's hands *three* times; when the defendant failed to comply after the third request, officers drew their weapons and gave the order again. *Id.* The defendant refused again. *Id.* Officers then approached the defendant with their weapons drawn and gave the order again; the defendant complied, and officers conducted a pat-down but found no weapons. *Id.* Officers did not handcuff the defendant, and they withdrew their weapons once the defendant complied. *Id.* However, perhaps most importantly, the court in *Rodriguez* determined that the officers' interaction with the defendant began as an encounter and therefore no reasonable suspicion was necessary. *Id.*

By contrast, here, the evidence shows that (1) the officers were not responding to any call, (2) Snyder was not attempting to flee from the officers, and (3) officers detained Snyder from the moment they exited their cars and saw him; thus, the officers needed reasonable suspicion at the inception of the stop in order for the detention to be lawful. *See Terry v. Ohio*, 392 U.S. 1, 21; 88 S. Ct. 1868, 1880 (explaining that for an officer's initial action to be justified, the officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion"). Snyder's detention began the moment the three officers pulled their weapons; therefore, it is at this point the officers needed reasonable suspicion.

9

An officer may use force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *See Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997); *see also Campbell v. State*, 325 S.W.3d 223, 234 (Tex. App.—Fort Worth 2010, no pet.) (holding that handcuffing a suspect does not always constitute an arrest). Here, the degree of incapacitation was more than necessary to simply safeguard the officers and assure the suspect's presence during the period of investigation. *Compare State v. Moore*, 25 S.W.3d 383, 387 (Tex. App.—Austin 2000, no pet.) (holding that while officers had reasonable suspicion to investigate the defendant, handcuffing transformed the detention into an arrest for which there was no probable cause),[6] *with Mays v. State*, 726 S.W.2d 937, 944 (Tex. Crim. App. 1986) (holding that officer had reasonable suspicion to handcuff and detain two men, on the grounds of officer safety, after he responded to a burglary call alone and both men were larger than he and were suspected of burglary); *Chambers v. State*, 397 S.W.3d 777, 782 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (explaining that while an officer used a weapon and handcuffs to detain

---

[6]In *Moore*, two officers responded to a call at a convenience store at 10:10 p.m. in response to a reported forgery. 25 S.W.3d at 384. Officers found a concealed handgun permit on the defendant and handcuffed him for "safety." *Id.* at 385. The court held that because forgery was not a crime commonly associated with violence, officers were in a brightly lit store and not a dark street or vacant lot, the defendant was compliant, officers did not find a weapon, and the officers outnumbered the defendant two to one, "there [was] simply no evidence that the officers had reason to fear for their safety or any other justification for handcuffing [the defendant] while pursuing their investigation." *Id.* at 387.

10

the defendant, the amount of force was reasonable under the circumstances: (1) there were multiple suspects, (2) the officer's partner was dealing with another suspect, (3) it was after 2:00 a.m., and (4) they were in a high-crime area where the officer had previously experienced several incidents involving narcotics, weapons, and fighting, including one shooting).

Although the area may have been a high-crime area, it was 4:30 in the afternoon, there were no reports of criminal activity, and the officers outnumbered Snyder four to one. Furthermore, after removed from the bushes Snyder cooperated fully, and the officers found no weapons on Snyder. *Cf. Salazar v. State*, 805 S.W.2d 538, 539–40 (Tex. App.—Fort Worth 1991, pet. ref'd) (holding that given the circumstances, officers had reasonable suspicion to detain a defendant that appeared to be hiding from police in a car: (1) there was a robbery in progress, (2) there were multiple suspects, (3) a suspect had shot at an officer, (4) defendant was located near where the crime was taking place, (5) defendant appeared to be reaching for something inside the car, and (6) defendant tried to leave).

Based on our review of the case law and the totality of the circumstances, we conclude that there is no evidence of specific, articulable facts showing reasonable suspicion to detain Snyder. Therefore, there is no evidence from which a rational jury could determine that Snyder's detention was lawful. We

11

sustain Snyder's second issue.  *See St. George*, 237 S.W.3d at 726; *see also Domingo*, 82 S.W.3d at 618.[7]

### III. Conclusion

Because the evidence is insufficient to support Snyder's guilt, we reverse the trial court's judgment and render a judgment of acquittal.[8]  *See* Tex. R. App. P. 43.2(c), 51.2(d); *Greene v. Massey*, 437 U.S. 19, 24–25, 98 S. Ct. 2151, 2154–55 (1978); *Burks v. United States*, 437 U.S. 1, 16–18, 98 S. Ct. 2141, 2150–51 (1978); *Winfrey v. State*, 393 S.W.3d 763, 774 (Tex. Crim. App. 2013).

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 20, 2014

---

[7]As in *Domingo*, before he was taken to jail for identification, Snyder had provided the same name, date of birth, and social security number each time Sergeant Leach asked him for his identification.  *See* 82 S.W.3d at 619. Sergeant Leach testified that he thought Snyder was being dishonest about who he was and took him to jail for identification because he could not locate "Jim James Morgan" in the system, Jim and James were similar names, and Jim is a nickname for James.

[8]Because Snyder's second issue affords him the greatest relief and is dispositive of the appeal, we need not address the motion to suppress.  *See* Tex. R. App. P. 43.3, 47.1; *Sinor v. State*, 612 S.W.2d 591, 592 (Tex. Crim. App. 1981).